In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1932

NELSON BENITEZ RAMOS,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition to Review an Order of the
Board of Immigration Appeals.
No. A098 169 980.

ARGUED OCTOBER 30, 2009—DECIDED DECEMBER 15, 2009

Before CUDAHY, POSNER, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The Board of Immigration
Appeals denied Nelson Alejandro Benitez Ramos's ap-
plication for withholding of removal, a remedy that is
similar to asylum (the deadline for applying for which
Ramos had missed) but that requires the applicant to
establish a higher probability of persecution should he be
returned to his native country. The ground of the denial

was that Ramos is not a member of "a particular social group." Persecution on the basis of membership in such a group is, along with persecution on the basis of "race, religion, nationality, . . . or political opinion," a ground for granting asylum or withholding of removal. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1), 1231(b)(3). There is no statutory definition of "particular social group," but the Board has sensibly defined it as a group whose members share "common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities." *In re Kasinga*, 21 I. & N. Dec. 357, 366 (BIA 1996); see also *Lwin v. INS*, 144 F.3d 505, 511-12 (7th Cir. 1998); *In re Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985), overruled on other grounds by *In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). As we explained in *Gatimi v. Holder*, 578 F.3d 611, 614 (7th Cir. 2009), "if the 'members' [of an alleged particular social group] have no common characteristics they can't constitute a group, and if they can change those characteristics—that is, cease to belong to the group—without significant hardship, they should be required to do so rather than be allowed to resettle in America if they do not meet the ordinary criteria for immigration to this country."

Ramos testified at his hearing before an immigration judge that he had been born and grew up in El Salvador and that in 1994, when he was 14, he had joined the Mara Salvatrucha, a violent street gang. See, e.g., Luz E. Nagle, "Criminal Gangs in Latin America: The Next Great Threat to Regional Security and Stability?," 14 *Tex. Hisp. J.L. & Policy* 7, 9-10 (2008); USAID Bureau for Latin American and

Caribbean Affairs, "Central America and Mexico Gang Assessment," pp. 9, 34 (Apr. 2006), www.usaid.gov/ locations/latin_america_caribbean/democracy/gangs_ assessment.pdf (visited Nov. 12, 2009); Juan J. Fogelbach, Comment, "Mara Salvatrucha (MS-13) and Ley Anti Mara: El Salvador's Struggle to Reclaim Social Order," 7 *San Diego Int'l L.J.* 223 (2005). He remained a member of the gang until 2003, when he came to the United States. Shortly afterward, having become a born-again Christian, he decided that if he returned to El Salvador he could not rejoin the gang without violating his Christian scruples and that the gang would kill him for his refusal to rejoin and the police would be helpless to protect him—"unable or unwilling to protect him against the private parties," as we put it in *Garcia v. Gonzales*, 500 F.3d 615, 618 (7th Cir. 2007). He has MS tattoos on his face as well as his body, but even if he had them removed the gang would recognize him. MS is active in the United States as well. See, e.g., Nagle, *supra*, at 9-10; Geoff Thale & Elsa Falkenburger, "Youth Gangs in Central America: Issues in Human Rights, Effective Policing, and Prevention" 2-4 (Washington Office on Latin America Special Report, Nov. 2006), www.wola.org/media/gangs_report_ final_nov_06.pdf (visited Nov. 12, 2009); Matthew Brzezinski, "Hillbangers," *New York Times*, Aug. 15, 2004, § 6, p. 38. But there is no suggestion that the U.S. branch poses any threat to Ramos.

In a characteristically terse, one-member opinion, the Board ruled against Ramos on the ground that "tattooed, former Salvadoran gang members" do not constitute a particular social group; nor can "membership in a

criminal gang . . . constitute membership in a particular social group." The second point is correct—at least in general. *Arteaga v. Mukasey*, 511 F.3d 940, 945-46 (9th Cir. 2007); *In re E-A-G-*, 24 I. & N. Dec. 591, 595-96 (BIA 2008). As we said in *Bastanipour v. INS*, 980 F.2d 1129, 1132 (7th Cir. 1992), "whatever its precise scope, the term 'particular social groups' surely was not intended for the protection of members of the criminal class in this country, merely upon a showing that a foreign country deals with them even more harshly than we do. A contrary conclusion would collapse the fundamental distinction between persecution on the one hand and the prosecution of nonpolitical crimes on the other." Being a member of a gang is not a characteristic that a person "cannot change, or should not be required to change," provided that he can resign without facing persecution for doing so. *Arteaga v. Mukasey*, *supra*, 511 F.3d at 945-46.

But if he *can't* resign, his situation is the same as that of a former gang member who faces persecution for having quit—the situation Ramos claims to be in. A gang is a group, and being a former member of a group is a characteristic impossible to change, except perhaps by rejoining the group. On this ground we held in *Gatimi v. Holder*, *supra*, that a former member of a violent criminal Kenyan faction called the Mungiki was a member of a "particular social group," namely former members of Mungiki. We relied on *Sepulveda v. Gonzales*, 464 F.3d 770, 771-72 (7th Cir. 2006), characteristically not cited in this case by either the Board or its lawyer, which holds that former subordinates of the attorney general of Colombia who had information about the insurgents

plaguing that nation constituted a particular social group. One could resign from the attorney general's office but not from a group defined as *former* employees of the office. See also *Koudriachova v. Gonzales*, 490 F.3d 255, 262-63 (2d Cir. 2007) (former KGB agents); *Cruz-Navarro v. INS*, 232 F.3d 1024, 1028-29 (9th Cir. 2000) (former members of the police or military); *Velarde v. INS*, 140 F.3d 1305, 1311-13 (9th Cir. 1998) (former bodyguards of the daughters of the president); *Chanco v. INS*, 82 F.3d 298, 302-03 (9th Cir. 1996) (former military officers); *In re Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988) (former members of the national police).

*Arteaga v. Mukasey*, *supra*, 511 F.3 at 946, using language borrowed from the Board's decision in *In re Acosta*, *supra*, 19 I. & N. Dec. at 233, states that "participation in . . . [gang activity] is not fundamental to gang members' individual identities or consciences, and they are therefore ineligible for protection as members of a social group." But this was said in reference not to Arteaga's status as a former gang member but to his possible status as a current member, for he had testified that he was still a member of the gang, though an inactive one. Ramos is a former member.

There are hints in the *Arteaga* opinion that being persecuted for being a former member of a gang should not be a basis for asylum or withholding of removal either. 511 F.3d at 945-46. That is not Congress's view. It has barred from seeking asylum or withholding of removal any person who faces persecution for having himself been a persecutor (a Nazi war criminal, for example) or who has

committed a "serious nonpolitical crime." 8 U.S.C. §§ 1158(b)(2)(A), 1231(b)(3)(B); see, e.g., *Negusie v. Holder*, 129 S. Ct. 1159, 1162 (2009); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419-25 (1999); *Doe v. Gonzales*, 484 F.3d 445 (7th Cir. 2007); *Guo Qi Wang v. Holder*, 583 F.3d 86, 90-91 (2d Cir. 2009) (per curiam); *Efe v. Ashcroft*, 293 F.3d 899, 904-06 (5th Cir. 2002). But it has said nothing about barring former gang members, perhaps because of ambiguity about what constitutes a "gang"; or because of the variety of activities, not all criminal, that some "gangs" engage in; or because of the different levels of participation, some innocuous, of members of some gangs.

The Board has never given a reasoned explanation for why the statutory bars to which we have just referred should be extended by administrative interpretation to former members of gangs. (It's not even clear that the Board thinks that *all* former members of *every* gang should be barred from obtaining asylum or withholding of removal.) Such an extension might be thought perverse in a case like this. Ramos would not have quit the gang had he thought he'd be sent back to El Salvador, and if he is sent back his only hope of survival (assuming that his fear of persecution is well founded, an issue not before us) will be to abandon his Christian scruples and rejoin the gang.

The government's brief, in violation of the *Chenery* doctrine, argues that the Board's decision should be affirmed on a ground not mentioned by the Board: that to be a "particular social group" a group must have "social visibility." By this the government means—and its

lawyer was emphatic at argument that it is the Board's meaning and there is support for his claim in cases like *In re S-E-G*, 24 I. & N. Dec. 579, 586 (BIA 2008); *In re E-A-G-, supra*, 24 I. & N. Dec. at 594; *In re A-T-*, 24 I. & N. Dec. 296, 304 n. 4 (BIA 2007), vacated and remanded on other grounds by 24 I. & N. Dec. 617 (Attorney General 2008), and especially *In re C-A*, 23 I. & N. Dec. 951, 959-61 (BIA 2006)—that you can be a member of a particular social group only if a complete stranger could identify you as a member if he encountered you in the street, because of your appearance, gait, speech pattern, behavior or other discernible characteristic.

This position has some judicial support, see, e.g., *Scatambuli v. Holder*, 558 F.3d 53, 59-60 (1st Cir. 2009); *Ramos-Lopez v. Holder*, 563 F.3d 855, 862 (9th Cir. 2009), but we have rejected it in *Gatimi* and other cases, cited in *Gatimi*, as a misunderstanding of the use of "external" criteria to identify a social group; see the illuminating discussion in *Castellano-Chacon v. INS*, 341 F.3d 533, 546-49 (6th Cir. 2003). If society recognizes a set of people having certain common characteristics as a group, this is an indication that being in the set might expose one to special treatment, whether friendly or unfriendly. In our society, for example, redheads are not a group, but veterans are, even though a redhead can be spotted at a glance and a veteran can't be. "Visibility" in the literal sense in which the Board has sometimes used the term might be relevant to the likelihood of persecution, but it is irrelevant to whether if there is persecution it will be on the ground of group membership. Often it is unclear whether the Board is using the term "social visibility" in

the literal sense or in the "external criterion" sense, or evenwhether it understands the difference. See, e.g., *In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 74-75 (BIA 2007).

*Arteaga* offered an alternative argument for why former gang members should not be considered members of a particular social group—that "the category of non-associated or disaffiliated persons in this context is far too unspecific and amorphous to be called a social group." 511 F.3d at 946. Although the Board in its opinion in this case cited *Arteaga*, it did not mention this argument. There may be categories so ill-defined that they cannot be regarded as groups—the "middle class," for example. But this problem is taken care of by the external criterion—if a Stalin or a Pol Pot decides to exterminate the bourgeoisie of their country, this makes the bourgeoisie "a particular social group," which it would not be in a society that didn't think of middle-class people as having distinctive characteristics; it would be odd to describe the American middle class as "a particular social group." Ramos was a member of a specific, well-recognized, indeed notorious gang, the former members of which do not constitute a "category . . . far too unspecific and amorphous to be called a social group." It is neither unspecific nor amorphous. Arteaga was an "inactive" member of a gang, a status that could be thought to lend it a certain amorphousness.

We can imagine the Board's exercising its discretion to decide that a "refugee" (that is, a person eligible for asylum) whose claim for asylum is based on former membership in a criminal gang should not be granted

asylum. The Board has discretion to deny asylum to eligible persons, 8 U.S.C. § 1158(b)(1); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n. 5 (1987); *Ghebremedhin v. Ashcroft*, 392 F.3d 241, 244 (7th Cir. 2004), subject to judicial review for abuse of discretion. 8 U.S.C. § 1252(a)(2)(B)(ii); *Groza v. INS*, 30 F.3d 814, 821 (7th Cir. 1994); *Doherty v. INS*, 908 F.2d 1108, 1117-18 (2d Cir. 1990), reversed on other grounds by 502 U.S. 314 (1992). But that was not the Board's ground in this case, and it could not have been. Ramos is seeking not asylum but withholding of removal, and withholding of removal is mandatory if the applicant (unless he falls within the statutory exceptions, 8 U.S.C. § 1231(b)(3)(B); *INS v. Aguirre-Aguirre, supra*, 526 U.S. at 419; *Ali v. Ashcroft*, 395 F.3d 722, 730 (7th Cir. 2005)) establishes that if expelled from the United States he is more likely than not to be persecuted for a reason recognized in the immigration law as a proper ground for asylum or for withholding of removal. The reason for the difference is that an asylum seeker need prove only a well-founded fear of persecution. The applicant for withholding of removal must prove that he will (more likely than not) be persecuted. His danger is greater, and the Board may not subject him to it if he meets the other criteria for withholding of removal.

Ramos was a member of a violent criminal group for nine years. If he is found to have committed violent acts while a member of the gang (as apparently he did, although the evidence is not entirely clear), he may be barred from the relief he seeks for reasons unrelated to whether he is a member of a "particular social group"; for remember the bar for aliens who commit a serious nonpo-

litical crime. The Board must also determine whether Ramos is more likely than not to be persecuted if he is returned to El Salvador. See 8 U.S.C. § 1231(b)(3); *Gonzales v. Thomas*, 547 U.S. 183, 184-87 (2006) (per curiam); *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam); *Uriostegui v. Gonzales*, 415 F.3d 660, 665 (7th Cir. 2005); *Konan v. Attorney General*, 432 F.3d 497, 501-02 (3d Cir. 2005); *Bushira v. Gonzales*, 442 F.3d 626, 633 (8th Cir. 2006). In this connection, we note with disapproval the immigration judge's mention of a letter from the U.S. embassy in El Salvador stating implausibly that MS does not punish defectors whose defection was motivated by Christian beliefs. The letter had not been seen by the parties, just by the judge; and while he said that he wasn't relying on it, this makes us wonder why he mentioned it. Should he wish to consider it on remand, he must give Ramos an opportunity to respond to it. 8 U.S.C. § 1229a(b)(4)(B).

The petition is granted, the Board's decision vacated, and the case remanded.